[Crim. No. 6515.   First Dist., Div. One.   June 28, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. MAURICE SEALS, Defendant and Appellant.

Frances L. Hancock, under appointment by the Court of Appeal, and Hancock & Hancock for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Robert R. Granucci and Timothy A. Reardon, Deputy Attorneys General, for Plaintiff and Respondent.

ELKINGTON, J.—Defendant appeals from a judgment of imprisonment in the state prison entered upon a jury verdict finding him guilty of violating Penal Code section 12021. This section provides that one previously convicted of a felony who possesses a concealable firearm is guilty of a felony.

We state the facts in the light most favorable to the People as we are required to do following a guilty verdict. (*People* v. *Sweeney*, 55 Cal.2d 27, 33 [9 Cal.Rptr. 793, 357 P.2d 1049]; *People* v. *Caritativo*, 46 Cal.2d 68, 70 [292 P.2d 513].)

Shortly after midnight, November 6, 1966, officers of the police prostitution detail were observing an apartment house in Oakland. They had information that some of its vacant rooms were being used by prostitutes in their business, and they had previously participated in prostitution arrests on the premises. They saw two known prostitutes enter the building with two men. The officers followed the four into the building, entering through double swinging doors at the front of the building. These doors were always kept unlocked. There were

no "keep out" signs. The officers apprehended the girls but the men could not be found. The officers looked into open vacant apartments. In one of these they saw a box spring and mattress on the floor; there were no other furnishings.

While the police were in the first floor hallway endeavoring "to determine where these two people had disappeared," defendant Maurice Seals entered through the front door. The officers recognized him and knew him to be a convicted felon. They had information that he was carrying a gun and that he was involved in allowing prostitutes to use the vacant rooms of the building. One of them called out, "Maurice, I'd like to talk to you."

Defendant turned into a vacant apartment. As he did the officers saw a revolver in his hand. The officers followed and saw him pushing a window open with the gun in his hand. The window opened and the officers saw defendant make a throwing motion. He was arrested and searched. The officers found seven rounds of ammunition in his pocket and 2 or 3 feet outside the window they saw a gun. The gun was loaded and its shells matched those found in defendant's pocket.

Defendant contends on this appeal, as he did below, that the entry and presence of the police officers in the apartment building were violative of the Fourth Amendment and that all evidence thereafter acquired by the police was tainted and inadmissible.

█ It appears to be settled that police officers in performance of their duty may, without doing violence to the Constitution, enter upon the common hallway of an apartment building without warrant or express permission to so do.

In *United States* v. *St. Clair*, 240 F.Supp. 338, federal agents had entered the "common hallway" of an apartment house. It was contended that such an entry caused an ensuing search to be invalid under the Fourth Amendment. Ruling against the defendant the court stated (p. 340): "The hallway, used by tenants and the public alike, was not part of the defendant's apartment. The fact that the door leading to it from the street was locked for the security of the tenants did not make the hallway part of the defendant's dwelling so that his constitutional privilege under the Fourth Amendment extended thereto. To hold otherwise would extend the protection under the Fourth Amendment beyond its purpose. Its essential aim is to protect the right of privacy in one's home and effects against arbitrary and unlawful invasion. Only unreasonable search and seizure is condemned; reasonable

search is not. In urban centres—and most of the nation today is urbanized—the multi-family dwelling is the mode of life. Apartments in some structures number in the hundreds. It is not uncommon—indeed it is usual—that in some dwellings the entrance doors from the street to the common corridors leading to the apartments are locked for security reasons and entry is gained either by a key possessed by the apartment occupant, or by a buzzer system whereby one notifies the occupant who, if he desires to admit the caller, responds by releasing the locked door. In this circumstance, to hold that the common corridors, public hallways, landings and stairwells may be considered part of the tenant's home and that his right of privacy under the Fourth Amendment extends to such areas, would raise unreasonable barriers to law enforcement.''

In *Polk* v. *United States*, 314 F.2d 837 (cert.den. 375 U.S. 844 [11 L.Ed.2d 72, 84 S.Ct. 96]) the court found no invasion of defendant's freedom from unreasonable search. There police officers, after rapping on a front door without response, ''attempted to carry out their mission by going to the rear door. They did so by proceeding through a passageway, pushing past a gate having no latch and standing ajar, and climbing an outside staircase, all of which were for the joint use of the residents of both flats in the house, and which, to all appearances, were open for the use of tradesmen and other persons having legitimate business with any of the residents.'' (P. 838.) Evidence secured after the entry was held to be admissible.

*United States* v. *Lewis,* 227 F.Supp. 433, concerned narcotics agents who had followed defendant into her apartment building. They stationed themselves on a staircase where they could observe the hallway leading to defendant's apartment and from that position obtained evidence. The court held the evidence admissible stating (p. 436): ''The building with which we are concerned here was a six story elevator apartment house with a substantial number of tenants. There was nothing in the record indicating that it differed from other similar buildings in New York. In the absence of anything to the contrary, it must be assumed that, as in similar buildings, the elevators, stairs and hallways were open to anyone having business with any occupant of an apartment. . . . Whatever rights defendant had in these areas was simply to use them in common with other tenants and such members of the public as had business there. [ ¶ ] Defendant had no constitutionally

protected rights of privacy in these areas which were invaded by the presence of the agents, . . .''

In *United States* v. *Buchner,* 164 F.Supp. 836 (cert.den. 359 U.S. 908 [3 L.Ed.2d 573, 79 S.Ct. 584) police officers entered an apartment building and proceeded down the hallway to defendant's apartment where they obtained evidence. The court held that the ''protection guaranteed by the Fourth Amendment should not be extended to include 'relatively public corridors.' '' (P. 839.)

The Supreme Court of New Jersey in *State* v. *Smith,* 37 N.J. 481 [181 A.2d 761] (cert.den. 374 U.S. 835 [10 L.Ed.2d 1055, 83 S.Ct. 1879]), held that the common hallway of a three-family dwelling was not a constitutionally protected area. There, investigating policemen observed criminal conduct while in the hallway looking through a crack of a door. The court said (p. 769) : ''Whether the officers were technically 'invitees' of the owner of the house is of no moment. Rather the question is whether there was an invasion of the privacy of the owner or tenant as to which the defendant might assert a derivative interest. As to the owner, surely a policeman does not trespass when he enters the common areas in discharge of his duties. And as to the tenant (defendant's mother), it cannot be said that she was in possession of the passageway. Thus the presence of the detectives at the door to the apartment itself involved no misconduct or invasion of the rights of anyone. A policeman is not out-of-bounds when he is in the common passageway of a multi-family house in the furtherance of an investigation.''

*State* v. *Smith, supra,* has been cited with approval in *People* v. *King,* 234 Cal.App.2d 423, 431-432 [44 Cal.Rptr. 500]. (See also *People* v. *Willard,* 238 Cal.App.2d 292, 307 [47 Cal. Rptr. 734].)

█ It is urged that in any event the police were trespassers. Assuming *arguendo* that they were, it has been repeatedly held that the Fourth Amendment forbids unreasonable searches, not trespasses, and that a simple trespass without more will not invalidate a subsequent search or seizure. (*Teasley* v. *United States,* 292 F.2d 460, 464; *Giacona* v. *United States,* 257 F.2d 450 (cert.den. 358 U.S. 873 [3 L.Ed.2d 104, 79 S.Ct. 113]) ; *United States* v. *Lodahl,* 264 F.Supp. 927.)

█ Even if we were to hold contrary to the rule announced in the *St. Clair, Polk, Lewis, Buchner,* and *Smith* cases, *supra,* the criticized conduct of the police in this case

would still be consistent with Fourth Amendment requirements. After midnight the officers saw two known prostitutes with two men enter an apartment house known to be used for purposes of prostitution. They had reasonable cause to believe that one or more public offenses (i.e., Pen. Code, §§ 316, 318, 647, subd. (b)) were being committed in their presence and accordingly had a right to arrest the offenders. (Pen. Code, § 836, subd. 1.) To make the arrest they had a right to enter the apartment house. (Pen. Code, §§ 835a, 844.)

We hold that the conduct of the police officers was not in contravention of the Fourth Amendment, and that the court properly admitted the questioned evidence.

■ Defendant also contends that the trial court erred in failing to instruct the jury in the language of CALJIC (California Jury Instructions, Criminal) instruction No. 54-B, or a modification thereof. This instruction states: ''The fact that a witness had been convicted of a felony, if such be a fact, may be considered by you [for only one purpose, namely,] in judging the credibility of that witness. The fact of such a conviction does not necessarily destroy or impair the witness's credibility, and it does not raise a presumption that the witness has testified falsely. It is simply one of the circumstances that you are to take into consideration in weighing the testimony of such a witness.''

Defendant took the stand in his own behalf. On cross-examination he admitted suffering three prior felony convictions. One of those convictions was an element of the offense for which defendant was on trial. It is in relation to the remaining two prior convictions that the instant claim of error is made. Defendant contends that as to those convictions the jury should have been instructed in the language of CALJIC No. 54-B.

With reference to the prior convictions of the instant claim of error, the record indicates the following proceedings at the time of their admission into evidence. ''Q. All right, and isn't it also a fact that you were convicted of the crime of possession of narcotics on September 22d, 1955? DEFENDANT: Marijuana selling, right. THE COURT: One moment, if you please. Before the witness answers the question, *this line of interrogation is likewise admitted only as the same might relate to credibility in the finding of the jury,* and upon this subject you will be instructed at the proper time to consider it for no other purpose than that for which it is admitted. . . . Q. I see. And isn't it a fact also that on May the 15th, 1959 you

were convicted of the felony of ex-con with a gun? DEFEND-ANT: Yes. THE COURT: Hold it a moment, please. *Again this line of interrogation and any answer to the question is admitted for the limited purpose that I noted just a moment ago insofar as the same, in the finding of the jury might affect the credibility of the witness* and on this subject you will be instructed at the proper time.'' (Italics added.)

Later, in the court's formal instructions to the jury they were told, ''In determining the credibility of a witness, you may consider . . . his prior conviction of a felony.''

While it would have been better practice to more fully instruct on the effect to be given evidence of defendant's prior convictions, we cannot say that the failure of the court to do so was error. ██ Even if there be error, applying the test of *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243], we are of the opinion, after an examination of the entire cause, including the evidence, that it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of the complained of error.

The judgment is affirmed.

Molinari, P. J., and Sims, J., concurred.